**NO. 26-1538**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

**EDWARD E. BINTZ,**
**Appellant**

**v.**

**THE FEDERAL EMERGENCY MANAGEMENT AGENCY, THE DEPARTMENT OF HOMELAND SECURITY, AND CAMERON HAMILTON,**
**Appellees**

---

**Appeal from the United States District Court**
**for the District of Delaware**
**(Civ. Action No. 22-738-GBW)**

---

**Brief for Appellee United States of America**

---

**Benjamin L. Wallace**
**United States Attorney**

Claudia L. Pare
Assistant United States Attorney

1313 N. Market Street, Suite 400
Wilmington, DE 19801
(302) 573-6603

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ........................................................ 1

STATEMENT OF ISSUES ........................................................ 2

STATEMENT OF RELATED CASES AND PROCEEDINGS ................ 3

STATEMENT OF THE CASE ........................................................ 4

I. FEMA's Flood Risk Analysis and Mapping Activities .................. 4

II. FEMA's Flood Risk Analysis and Mapping Activities in South Bethany ........................................................ 9

A. FEMA issued a 13-foot BFE for South Bethany in 2015....... 9

B. Appellant sought judicial review of FEMA's 2015 Preliminary FIRM ........................................................ 10

C. FEMA issued a 12-foot BFE for South Bethany in 2021..... 11

III. District Court Litigation ........................................................ 13

SUMMARY OF ARGUMENT ........................................................ 17

STANDARD OF REVIEW ........................................................ 18

ARGUMENT ........................................................ 20

I. FEMA's Final BFE Determination Was Based on the Relevant Factors and Was Not Arbitrary or Capricious .............................. 20

A. FEMA's conclusion that Hurricane Sandy and Winter Storm Jonas were 10-Year or less events was not arbitrary or capricious ........................................................ 22

B. FEMA's treatment of the 1999 revetment as the representative structure geometry for flood mapping purposes was not arbitrary or capricious ................................................ 27

C. FEMA's identification of a PFD running along Ocean Drive was not arbitrary or capricious ................................................ 30

D. FEMA's application of a Modified Erosion Methodology was not arbitrary or capricious........33

E. FEMA's wave runup calculations were not arbitrary or capricious........38

F. FEMA's conclusion that Appellant's alternate analysis did not result in a more correct analysis was not arbitrary and capricious........45

CONCLUSION........47

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bintz v. Fed. Emergency Mgmt. Agency,*
413 F. Supp. 3d 349 (D. Del. 2019) ..................................................... passim

*Biodiversity Conservation All. v. U.S. Forest Serv.*,
765 F.3d 1264 (10th Cir. 2014) ............................................................... 22

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974)................................................................................. 19

*CBS Corp. v. FCC*,
663 F.3d 122 (3d Cir. 2011) ..........................................................18, 19

*Hughes River Watershed Conservancy v. Johnson*,
165 F.3d 283 (4th Cir. 1999) ................................................................. 26

*MD Mall Assocs. v. CSXTransp.*,
715 F.3d 479 (3d. Cir. 2013) ................................................................. 18

*Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)............................................................................. passim

*SBS Inc. v. FCC*,
414 F.3d 486, 496 (3d Cir. 2005) ........................................................ 18

*Southwestern Bell Tel. Co. v. FCC*,
168 F.3d 1344 (D.C. Cir. 1999)............................................................. 18

*Town of Winthrop v. F.A.A.*,
535 F.3d 1 (1st Cir. 2008)....................................................................... 26

*Vanderklok v. United States*,
868 F.3d 189 (3d Cir. 2017) ................................................................... 5

*Yitang Sheng v. Att'y Gen. of U.S.*,
365 F. App'x 408 (3d Cir. 2010) .............................................19, 38, 39

**Statutes**

5 U.S.C. § 706(2)(A) .......... 18

28 U.S.C. § 1291.......... 1

28 U.S.C. § 1331.......... 1

42 U.S.C. § 4001.......... 4

42 U.S.C. § 4001(a) .......... 4

42 U.S.C. § 4011.......... 4

42 U.S.C. § 4012(a) .......... 5

42 U.S.C. § 4101..........7, 20

42 U.S.C. § 4101(a) .......... 8

42 U.S.C. § 4101a.......... 5

42 U.S.C. § 4101b(b)(3)(D).......... 7

42 U.S.C. § 4104(a) .......... 8

42 U.S.C. § 4104(e) .......... 8, 9

42 U.S.C. § 4104(g).......... 45

**Regulations**

44 C.F.R. Part 65 .......... 46

44 C.F.R. Part 66 ..........7, 20

44 C.F.R. § 59.1..........5, 6, 7

44 C.F.R. § 59.2.......... 4

44 C.F.R. § 60.3.......... 6

44 C.F.R. § 64.3.......... 6

44 C.F.R. § 67.6(a) ..........45, 46

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The United States Court of Appeals for the Third Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

## STATEMENT OF ISSUES

Whether the District Court correctly held that the Federal Emergency Management Agency's flood mapping analysis in South Bethany was not arbitrary or capricious because it was based on consideration of relevant data and supported by satisfactory explanation.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The United States is not aware of any related cases.

## STATEMENT OF THE CASE

### I. FEMA's Flood Risk Analysis and Mapping Activities

In response to recurring "flood disasters" "plac[ing] an increasing burden on the Nation's resources," 42 U.S.C. § 4001(a), as well as concerns that the private insurance industry was unable to offer reasonably priced flood insurance nationally, *id.* § 4001(b), Congress established the National Flood Insurance Program ("NFIP") in 1968 pursuant to the National Flood Insurance Act ("NFIA"), 42 U.S.C. § 4001, *et seq*. The NFIP has three basic components: (1) the identification and mapping of flood-prone communities; (2) the requirement that communities adopt and enforce floodplain management regulations that meet minimum eligibility criteria to qualify for flood insurance; and (3) the provision of flood insurance. *Id.* § 4001; 44 C.F.R. § 59.2.

The Federal Emergency Management Agency ("FEMA") is empowered to administer the NFIP, and in doing so, maps flood elevations to identify flood hazards. 42 U.S.C. §§ 4011, 4101. More specifically, FEMA "may" "identify and publish information with respect to all floodplain areas . . . which ha[ve] special flood hazards,"

and "establish or update flood risk-zone data in all such areas" for those participating communities. 42 U.S.C. § 4101(a).[1] FEMA delineates flood hazards for a community on a map known as a Flood Insurance Rate Map ("FIRM"). 44 C.F.R. § 59.1. As floodplains are constantly changing, FIRMs are updated to reflect physiological, climatological, and engineering methodology changes. FEMA assesses "the need to revise and update all floodplain areas and flood risk zones identified, delineated, or established under this section, based on an analysis of all natural hazards affecting flood risks" "[o]nce during each 5-year period" or more often as FEMA determines necessary. *Id.* § 4101(e).[2]

---

[1] An "area of special flood hazards" is "the land in the flood plain within a community subject to a 1 percent or greater chance of flooding in any given year." 44 C.F.R. § 59.1. Property owners in certain special flood hazard areas are required to purchase flood insurance as a condition of receiving federal assistance for acquisition or construction of the property. 42 U.S.C. § 4012(a).

[2] FEMA works with communities to prioritize updates to flood hazard data based on relative need and funding limitations. As part of the strategy, and to maintain the validity of flood hazard data over time, FEMA assesses the inventory of FIRMs and its underlying flood risk studies to determine whether conditions on the ground are still adequately represented by the FIRM for that area. *See* FEMA, Coordinated Needs Management Strategy, https://www.fema.gov/flood-maps/tools-resources/risk-map/coordinated-needs-management-strategy (last visited Aug. 21, 2026). This website was brought to the District Court's attention below in Appellee's briefing, D.I. 24, at 3 n.3, of which the District Court was permitted to take judicial notice, *see Vanderklok*

A FIRM is prepared based on a Flood Insurance Study ("FIS") or restudy. 44 C.F.R. § 64.3. The FIS determines, among other information, water surface elevation, which is the "height . . . of floods of various magnitudes and frequencies in the flood plains," including the 10-year flood, 50-year flood, 100-year flood (referred to as the base flood elevation ("BFE")), and 500-year flood. 44 C.F.R. § 59.1. A BFE is a statistical number—a scientifically derived estimate of the water surface elevation that has a 1% chance of occurring in any given year. *Id.* It is used to guide development in the area and is promulgated by FEMA as the minimum elevation at which the lowest floor may be constructed for new buildings or for additions and certain renovations in participating communities. 44 C.F.R. § 60.3.

The flood hazard analysis and mapping process generally includes (and in this instance did include) the following steps: (1) define base topography; (2) evaluate water levels and storm surge; (3) define cross-shore transects[3] and identify the Primary Frontal Dune ("PFD")[4]; (4)

---

*v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017) ("It is appropriate to take judicial notice of information made publicly available by government entities." (cleaned up)).

[3] FEMA divides the coastline into "transects," which are cross sections of a beach that run perpendicular to the shoreline. Because each

evaluate storm-induced erosion and shore protection structures; (5) conduct wave hazard modeling; (6) conduct coastal flood hazard mapping; and (7) create FIS and FIRM.[5] *See* JA568-JA615.

For its flood mapping activities, FEMA uses scientific and technical data, including topography and elevation data, as well as "any relevant information or data of the National Oceanic and Atmospheric Administration and the United States Geological Survey relating to the best available science regarding future changes in sea levels, precipitation, and intensity of hurricanes." 42 U.S.C. § 4101b(b)(3)(D); *see also id.* § 4101(b)(1)(C). FEMA is also required to engage in regular communication, outreach, and consultation with the affected community. 42 U.S.C. §§ 4101, 4101b, 4107; 44 C.F.R. Part 66. FEMA

---

transect has different physical characteristics, sometimes adjacent transects have different BFEs.

[4] A PFD means a "continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms." 44 C.F.R. § 59.1.

[5] To help illustrate the process used by FEMA, a coastal mapping process is also presented in an infographic available at: https://www.fema.gov/sites/default/files/documents/fema_coastal-mapping_infographic_3-22-2021.pdf (last visited Aug. 21, 2026); *see also* D.I. 24, at 4 n.6.

issues standards, guidelines, and technical guidance on all aspects of creating and publishing flood hazard information. *See, e.g.*, JA486-JA533. FEMA is permitted to engage private companies to help perform its flood mapping analyses. 42 U.S.C. § 4101(a).

FEMA's flood hazard determinations and designations are subject to notice and comment as well as other due process requirements. 42 U.S.C. § 4104(a). Additionally, the affected community or an owner or lessee of real property within the affected community who believes their property rights to be adversely affected by the proposed determination may file an administrative appeal. *Id.* § 4104(b), (c). Under the statute, "[t]he *sole* grounds" for an administrative appeal is "the possession of knowledge or information indicating . . . the elevations being proposed . . . are scientifically or technically incorrect." *Id.* § 4104(b) (emphasis added).

FEMA then adjudicates appeals through consultation with community officials, by administrative hearing, or submission of conflicting data to an independent Scientific Resolution Panel. *Id.* § 4104(e). Any appellant aggrieved by FEMA's final determination "may appeal such determination to the United States district court for

the district within which the community is located." *Id.* § 4104(g).

## II. FEMA's Flood Risk Analysis and Mapping Activities in South Bethany

### A. FEMA issued a 13-foot BFE for South Bethany in 2015

FEMA engaged in remapping efforts for South Bethany (a town within Sussex County, Delaware) beginning in 2012 as part of a larger effort to update flood hazard data for most of the east coast. *See Bintz v. Fed. Emergency Mgmt. Agency* ("*Bintz I*"), 413 F. Supp. 3d 349, 355 (D. Del. 2019).[6] A prior FIRM from 2005 set the BFE for where Appellant's property is located at 12 feet.[7] *Id.* FEMA published an updated preliminary FIRM for South Bethany on December 23, 2013, which reduced the BFE to 10 feet ("2013 Preliminary FIRM"). *Id.*

During the administrative appeal period, a South Bethany councilmember appealed to FEMA arguing that FEMA should maintain the existing 12-foot BFE. *Id.* Pursuant to its process for adjudicating appeals, FEMA consulted with the community and obtained additional information that reflected greater flood risk in the study area than

[6] Appellant's property is located adjacent to Transect 1610 in South Bethany. *Id.*; JA6.

[7] The 2005 FIRM included a transition to NAVD88 (or "North American Vertical Datum of 1988") and all subsequent FIRMS use NAVD88. *See, e.g.*, JA 521, JA574, JA602.

initially projected. *Id.* at 355-56. Accordingly, FEMA revised the 2013 Preliminary FIRM to propose a 13-foot BFE to account for the additional, verified observational and historical data provided by the community. *Id.* at 356. FEMA later learned that the councilmember was not authorized to file an administrative appeal on behalf of South Bethany and rescinded the 2013 Preliminary FIRM, which restored the 12-foot BFE established by the 2005 FIRM. *Id.*

On May 18, 2015, FEMA issued another preliminary FIRM for South Bethany that proposed a 13-foot BFE ("2015 Preliminary FIRM"). *Id.* South Bethany and Appellant filed an appeal with FEMA. *Id.* at 357-59. Of note, Appellant argued that FEMA should set the BFE for South Bethany to 10 feet consistent with the 2013 Preliminary FIRM. *Id.* FEMA resolved both appeals, and the 13-foot BFE for South Bethany became final in 2017 ("2017 FIRM"). *Id.* at 358.

### B. Appellant sought judicial review of FEMA's 2015 Preliminary FIRM

On November 4, 2016, Appellant sought judicial review of the 2017 final BFE determination of 13 feet and again argued for a 10-foot BFE. *Id.* at 359. On September 4, 2019, the District Court concluded that FEMA "acted arbitrarily and capriciously and not in accordance

with law in developing the base flood elevations for South Bethany in the 2015 Preliminary Map," citing "discrepancies" in the record and "unsupported conclusions." *Id.* at 366. It then set aside the BFE for Transect 1610 and remanded to FEMA for further investigation. *Id.* at 368.

C. <u>FEMA issued a 12-foot BFE for South Bethany in 2021</u>

In response to the District Court's holding, FEMA issued a "Notice to Flood Insurance Rate Map (FIRM) User" ("NTU") on January 3, 2020, which had the effect of vacating the 2017 FIRM and study data found arbitrary and capricious by the District Court and reinstating the most recent previously effective data. JA160; JA6. Accordingly, the 2005 FIRM that set the BFE for South Bethany at 12 feet, became effective once again. JA6-JA7.

FEMA had originally intended to defer any future flood hazard re-analysis for South Bethany until a later date but learned about concerns from the community. JA7. Accordingly, in early May 2020, FEMA decided it would again undertake remapping efforts for South Bethany. *See id.* FEMA initially determined that the best course was to create two separate letter of map revisions ("LOMR"), one for the

riverine side and one for the coastal side of South Bethany.[8] *Id.* To assist this process, FEMA engaged a private firm, Compass, to conduct the detailed flood hazard and mapping tasks for South Bethany. *See, e.g.*, JA539-JA615. As part of its work, Compass issued a Project Narrative for the coastal hazard analysis and floodplain mapping. JA568-JA615.

FEMA issued a LOMR for the riverine side on July 30, 2020, and for the coastal side on February 4, 2021. JA7. However, after Appellant raised concerns on February 7, 2021, that the community was not given adequate time to consult and respond, FEMA rescinded both LOMRs on February 26, 2021. *Id.* Ultimately, FEMA issued one LOMR for South Bethany on September 27, 2021, with an effective date of February 14, 2022 ("2021 LOMR"). JA7; JA198.

By letter dated January 10, 2022 ("January 2022 Letter"), Appellant challenged several of FEMA's modeling assumptions and proposed alternate flood hazard determinations from those contained in the 2021 LOMR. JA208. FEMA carefully reviewed the letter and

---

[8] A LOMR is FEMA's modification to an effective FIRM. A LOMR is one method by which a FIRM can be updated on a more expedited schedule. LOMRs are not specific to a particular property or an address.

accompanying data as a formal comment. *See* JA337. After doing so, FEMA issued a letter dated April 4, 2022 ("Appeal Resolution Letter") concluding that revisions to the 2021 LOMR were not warranted. *Id.* In particular, FEMA noted that Appellant had not demonstrated that the alternative analysis proposed in his letter would result in a more correct estimate of a flood hazard determination. *Id.* FEMA also responded one-by-one to Appellant's comments, citing to several appendices. JA337-482. After issuing the Appeal Resolution Letter, FEMA also responded to various questions by Appellant via email and provided him with additional requested information. *See, e.g.*, JA483-485.

Because Appellant's January 2022 Letter tolled the effectiveness of the LOMR, FEMA reissued the LOMR on April 5, 2022, and it became effective the same day. JA58-JA67; JA8. The LOMR designated Appellant's property as having a BFE of 12. JA58-JA67; JA8.

## III. District Court Litigation

On June 6, 2022, Appellant filed a complaint under the judicial review provisions of the Administrative Procedure Act ("APA") against

Defendants FEMA, the Department of Homeland Security, and Cameron Hamilton[9] challenging FEMA's determination of the flood zone and base flood level in South Bethany, Delaware as arbitrary and capricious.[10] JA8.

The parties filed cross-motions for summary judgment. JA28. Appellant argued that FEMA's analysis was arbitrary and capricious for the following reasons: (1) FEMA mischaracterized Hurricane Sandy and Winter Storm Jonas as 10-year or less storms; (2) FEMA improperly treated a 1999 revetment as existing for more houses than it actually did; (3) FEMA incorrectly found a primary frontal dune with a dune line running along Ocean Drive; (4) FEMA made incorrect and misleading statements about its dune erosion methodology; (5) FEMA incorrectly applied its wave runup model; and (6) FEMA improperly concluded that its analysis was more correct than Appellant's. JA29.

On January 12, 2026, the District Court adopted the Magistrate Judge's Report and Recommendation, denied Appellant's Motion for

[9] Appellant originally filed suit against Deanne Criswell, who held the post of FEMA Administrator at the time of his suit. Cameron Hamilton is the current FEMA Administrator.

[10] In his complaint, Appellant also included claims that FEMA's actions following remand in *Bintz I* violated the federal court's mandate rule and the APA. JA8. Those claims are not before this Court.

Summary Judgment, granted Appellee's Cross Motion for Summary Judgment, and entered judgment in favor of Appellees. JA2.

The District Court held *first* that FEMA adequately explained the reasoning behind its methodology for determining storm return frequencies and that FEMA's resulting determination that Hurricane Sandy and Winter Storm Jonas were 10-year or less was neither arbitrary nor capricious. JA11-JA12; JA30-JA32. *Second*, FEMA did not act arbitrarily or capriciously by relying on information provided by the Delaware Department of Natural Resources and Environmental Control to conclude that oceanfront properties are revetted. JA13-JA14; JA32-JA35. *Third*, FEMA examined the relevant data and provided a satisfactory explanation for its identification of the primary frontal dune, and there was a rational connection between the facts and the decision. JA14-JA17; JA35-JA37. *Fourth*, FEMA sufficiently justified its selection of a modified erosion method over a standard erosion method. JA17-JA20; JA37-J40. *Fifth*, FEMA's wave runup calculations were not arbitrary and capricious and FEMA adequately explained why it did not remove wave set up from its model. JA20-JA21; JA40-JA43. *Finally*, FEMA's rejection of Appellant's alternative analysis was not

arbitrary or capricious.[11] JA44-JA45.

On March 11, 2026, Appellant appealed to this Court. JA1.

---

[11] Appellant did not object to the Magistrate Judge's Report and Recommendation's conclusion that FEMA did not act arbitrarily or capriciously by rejecting Appellant's alternative analysis. *See* JA10; JA44-JA45.

## SUMMARY OF ARGUMENT

Appellant contends that FEMA's determination was based upon invalid analyses and unsupported facts, assumptions, and conclusions. What Appellant has failed to do, however, is carry his burden to show that any aspect of that analysis was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Indeed, the record reflects the contrary; FEMA's determination was based upon the relevant facts and was adequately explained. Appellant's arguments are insufficient to overturn FEMA's determination under the deferential standard that applies.

This Court should affirm. However, to the extent the Court finds that Appellant has carried his burden, the proper remedy is limited to a remand to FEMA for additional investigation or analysis.

## STANDARD OF REVIEW

The District Court's grant of summary judgment is reviewed *de novo*. *See, e.g., MD Mall Assocs. v. CSXTransp.*, 715 F.3d 479, 485 n.6 (3d. Cir. 2013).

Under the APA, a court must uphold the agency's final action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) "This is a 'deferential standard' that 'presume[s] the validity of agency action.'" *SBS Inc. v. FCC*, 414 F.3d 486, 496 (3d Cir. 2005) (quoting *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999)). The scope of a court's review is "narrow." *Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). It must not "substitute its judgment for that of the agency." *Id.*

An agency's decision is not arbitrary or capricious so long as it examines the relevant data and "articulate[s] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *CBS Corp. v. FCC*, 663 F.3d 122, 137 (3d Cir. 2011) (internal quotation omitted). Rather, an agency's decision will only be found to be arbitrary where:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43). A reviewing court does not conduct its own *de novo* analysis but rather "must uphold the agency's findings unless the evidence not only supports a contrary conclusion but compels it." *Yitang Sheng v. Att'y Gen. of U.S.*, 365 F. App'x 408, 410 (3d Cir. 2010) (not precedential) (internal citations omitted). Indeed, courts should uphold even decisions "of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

## ARGUMENT

### I. FEMA's Final BFE Determination Was Based on the Relevant Factors and Was Not Arbitrary or Capricious

While Appellant disagrees with FEMA's flood mapping analysis in South Bethany, he fails to carry his burden to show that any aspect of that analysis was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. To the contrary, the record makes clear that FEMA examined the relevant data and relied on appropriate modeling assumptions to issue the 2021 LOMR. *See* JA539-JA615. FEMA then promulgated its final determination in compliance with the NFIA. *See* 42 U.S.C. §§ 4101, 4101b(d), 4102, 4107; 44 C.F.R. Part 66. After Appellant submitted his January 2022 Letter, FEMA reviewed it, and then responded, comment-by-comment, to Appellant's arguments and explained both why FEMA's LOMR was scientifically and technically correct and why Appellant had not demonstrated—as he was statutorily required to do—that the alternative modeling and mapping methods proposed in his letter would result in a more correct estimate of a flood hazard determination. *See* JA337-JA482.

Appellant criticizes both FEMA's explanation of its own analysis and its rejection of his alternate analysis. More specifically, according to Appellant, FEMA acted arbitrarily and capriciously and in violation of the law when it: (1) concluded Hurricane Sandy and Winter Storm Jonas were 10-year or less events; (2) treated a revetment as existing along all of Ocean Drive; (3) delineated a PFD along Ocean Drive; (4) used the Modified Erosion Methodology; (5) conducted its wave runup calculations; and (6) concluded Appellant's analysis did not result in more correct analysis. Appellant's Br. at 10-12. Appellant's arguments—which mischaracterize the record, imagine inconsistencies in FEMA's analysis that do not exist, and lob general criticisms FEMA's way—are untethered to the deferential standard that applies in APA challenges and insufficient to overturn FEMA's determination.

Fundamentally, Appellant's challenge is merely a disagreement with FEMA's conclusion and the methods it used to reach that conclusion, combined with a preference for his own analysis and result. That kind of squabble is not the basis for a challenge under the APA. Appellant cannot meet his burden to demonstrate that FEMA's

determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

A. FEMA's conclusion that Hurricane Sandy and Winter Storm Jonas were 10-year or less events was not arbitrary or capricious

Appellant first disagrees with FEMA's conclusion that Hurricane Sandy and Winter Storm Jonas were 10-year or less events.[12] Appellant's Br. at 14-18. He would have them classified as 30-year and 70-year storms, respectively.[13] *Id.* at 18-20. Appellant and FEMA used two different methodologies to analyze return frequencies, which resulted in different estimates of the return periods for the two events. But under APA review, the role of the court is to examine "whether the agency's chosen method is sound, not whether there are competing methods that might work as well." *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1270 (10th Cir. 2014).

As explained in the Appeal Resolution Letter, FEMA calculated

[12] A 10-year storm is colloquial term for the more technically accurate term, 10% annual exceedance rate, which describes an occurrence (like water levels from a storm) that has a 10% chance of being met or exceeded in any given year.

[13] A 30-year storm is one producing water levels that have a 3.33% (or 1/30) chance of being met or exceeded in a given year, and a 70-year storm is one producing water levels that have a 1.43% (or 1/70) chance of being met or exceeded in a given year.

Stillwater Elevation Levels ("SWELs") using information produced by the U.S. Army Corps of Engineers ("USACE") as part of the FEMA Region 3 Storm Surge Study ("Region 3 SSS"). JA339; JA362. That study uses more advanced frequency analysis (a Joint Probability Method, or "JPM") that accounts for wider regional climatology and a detailed 2D wave and surge model of 186 production storms that can account for the spatial variation of storm-induced water levels in a study area.[14] JA339. FEMA then compared the storm levels from the NOAA Lewes, Delaware tide gauge (the closest, most comparable tide gauge to South Bethany, which does not have a gauge of its own) to the calculated frequency data from the Region 3 SSS used in South Bethany.[15] *Id.* The JPM has been incorporated into the effective flood

[14] The JPM is recognized by FEMA as having "the conceptual advantage of considering all possible storms consistent with the local climatology." FEMA, "Guidance for Flood Risk Analysis and Mapping: Statistical Simulation Methods," (November 2023), at 1, available at https://www.fema.gov/sites/default/files/documents/fema_coastal-statistical-simulation-methods_nov-2016.pdf (last visited Aug. 21, 2026); *see also* D.I. 24, at 12 n.13.

[15] Appellant argues FEMA's comparison is inappropriate because Lewes is more sheltered than South Bethany. Appellant's Br. at 14-16. FEMA recognizes that the water levels for these storms measured at South Bethany could differ from the water levels measured at Lewes because storm surge values vary spatially along a shoreline. However, there was no tide gauge in South Bethany. Consequently, FEMA used the

maps for nearly every coastal community in the region and is the recommended statistical approach for FEMA. *Id.* Using this data, FEMA determined that Hurricane Sandy and Winter Storm Jonas were 10-year or less events. JA602. This analysis ensures the proper "apples to apples" comparison of individual storms within the overall description of storm frequency using the Region 3 SSS methods.

By contrast, Appellant compared the storm levels from the Lewes tide gauge to NOAA-calculated return periods at the Lewes tide station. JA209-JA210; JA339-JA340. But the NOAA-calculated return periods use a less refined and more limited tide gauge statistical analysis. Indeed, it leveraged only observed storms at the location of the gauge and does not account for the more advanced representation of storm statistics done with the Region 3 SSS. JA339-JA340. Unlike FEMA's,

---

storm water levels at the Lewes tide gauge because it is the closest, most comparable tide gauge to South Bethany given the hydraulic connectivity of the Lewes gauge with the Atlantic Ocean. Indeed, the Lewes tide gauge is close to the entrance of the Delaware Bay, which has an over 11-mile opening connecting it to the Atlantic Ocean. That means the Lewes gauge reflects open hydraulic connectivity with storm surge originating in the Atlantic Ocean. Ocean City, MD also has a tide gauge but was not an appropriate comparison given Ocean City is much more sheltered on the bayside of a barrier island with an inlet of approximately 0.2 miles. Accordingly, FEMA appropriately used data from Lewes after concluding it was the best estimate for water levels at South Bethany. *See generally* JA339.

Appellant's methodology relies purely on historical storm records, which by nature does not capture the possibilities of storm surge impacts for rare events like hurricanes. *See* FEMA, "Coastal Storm Surge Analysis: Storm Forcing," at 5, July 2013, https://apps.dtic.mil/sti/pdfs/ADA581410.pdf (last visited Aug. 7, 2026) ("The occurrence of hurricanes in the FEMA Region III domain is rare . . . . Those hurricanes that have impacted the region during the past 100 years or so, for which data are available represent a very small subset of the hurricanes that are possible."). FEMA's methodology thus accounts for wider regional climatology and a larger universe of storm data than Appellant's. And FEMA adequately explained why Appellant's approach was not "better or more correct" than FEMA's: "the historic record of 20 hurricanes in the past 60 years is insufficient for a 100-year recurrence interval analysis." JA339. Moreover, the return periods of the SWELs must be internally consistent. As FEMA has explained, the derivation of the 1-percent SWEL must be based on the same methods as the derivation of the return periods for historical storms. Appellant's approach inappropriately mixes and matches methods. For these reasons, Appellant's methodology—which relies on

return periods derived using different and less sophisticated methods than FEMA's—is demonstrably inferior to FEMA's approach. But under the APA, FEMA need not prove that its methodology was superior. So long as FEMA's choice of methodology was a reasonable one, Appellant's challenge must fail. *See Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999) ("Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to an agency's decision."); *accord Town of Winthrop v. F.A.A.*, 535 F.3d 1, 13 (1st Cir. 2008).

Appellant also cited 2013 and 2016 USACE documents in support of his analysis. JA225-JA227; JA237-JA244. But FEMA declined to give weight to the publications because they did not contain information regarding the basis for the estimates or other data used. JA340. In particular, the USACE documents did not provide any information regarding the basis for the initial recurrence interval estimates. *Id.* By contrast, the Region 3 SSS provides a technically justified and repeatable basis for estimate storm recurrence intervals. Moreover, there is no requirement that FEMA follow the same methodology or

reach the same conclusions as USACE.

Finally, Appellant contends that he presented a "common-sense reality check." Appellant's Br. at 19. But Appellant points to no authority suggesting that his "common-sense reality check" is an appropriate tool for determining return frequency. Rather, Appellant appears to fundamentally misunderstand FEMA guidance, the universe of available data, and the statistical analysis conducted to reach FEMA's estimates of returns.

In the end, although Appellant would have it otherwise, this Court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. In light of the "narrow" standard of review, *id.*, the only appropriate conclusion here is that FEMA examined the relevant data and sufficiently explained its method for determining storm return frequencies.

B. FEMA's treatment of the 1999 revetment as the representative structure geometry for flood mapping purposes was not arbitrary or capricious

Appellant also takes issue with FEMA's conclusion that the properties along Ocean Drive were revetted based on historical information provided by the Delaware Department of Natural

Resources and Environmental Control ("DNREC"). Appellant's Br. at 21-23. Here, again, Appellant has failed to show that this conclusion was arbitrary or capricious.

In the Project Narrative, Compass stated that, per discussions with DNREC officials, a buried rock revetment was constructed along the seaward edge of Ocean Drive. JA590-JA601. In his January 2022 Letter, Appellant argued that the revetment actually existed in front of only six houses toward the south of Ocean Drive and was made up of only one layer of stone (rather than two layers of stone). JA211. In response, FEMA stated that DNREC provided the information regarding the 1999 Revetment typical section to FEMA, and that DNREC noted that "with very few exceptions, this revetment design is what was built along the entire east side of Ocean Drive."[16] JA340. Although FEMA acknowledged that the two-layer stone design was apparently changed to one-layer, FEMA concluded that Appellant had not demonstrated that this change would have an appreciable effect on

[16] FEMA guidance provides that if "as-built documents" for a coastal protection structure are absent, then FEMA proceeds with "best available data, standard design and engineering assumptions, and conservative estimates of material properties." JA34 n.15. FEMA acted consistently with this guidance by using information provided to it by DNREC.

revetment Appellant or flood mapping results. *Id.* Therefore, FEMA retained the DNREC-supported conclusion that the revetment is present along the east side of Ocean Drive. *Id.* FEMA also noted that Appellant failed to provide technical justification for his preferred structure geometry or any corresponding mapping changes. *Id.* FEMA did not act arbitrarily and capriciously in so concluding.

Nevertheless, Appellant contends that his review of South Bethany *meeting minutes* demonstrates that DNREC is wrong. Appellant's Br. at 21-22. As an initial matter, it was plainly not arbitrary or capricious for FEMA to rely on information provided by DNREC rather than the minutes of the South Bethany Town Council. And, in any event, FEMA examined the information provided by Appellant in response to his administrative appeal, acknowledged that the two-layer stone design was changed to one-layer, but concluded that Appellant had not demonstrated that this change would have an appreciable effect on revetment performance or flood mapping results. *Id.* Consequently, Appellant has not shown that FEMA acted arbitrarily or capriciously either by relying on credible representations from an authoritative source on the matter—namely, the state agency

responsible for managing state natural resources and the environment—to conclude that oceanfront properties were revetted, or by concluding Appellant failed to provide more correct information.[17]

Because FEMA examined the relevant data and provided a satisfactory explanation for its finding that a revetment existed along the east side of Ocean Drive, its conclusion that oceanfront properties are revetted was not arbitrary or capricious

C. FEMA's identification of a PFD running along Ocean Drive was not arbitrary or capricious

Appellant argues that FEMA identified a PFD in South Bethany contrary to its own regulations and guidance. Appellant's Br. at 23. Not so.

FEMA applied the PFD from the effective Sussex County Flood Study dated March 16, 2015, consistent with its practice of looking to regional historic dune features. JA341; JA609. FEMA Standard 619 specifically provides that, when revising, the dune feature "must be as continuous as, or more continuous than, the effective PFD and provide an accurate representation of the regional dune feature." JA341.

[17] Nor has Appellant shown that FEMA had a duty to investigate further rather than relying on the information from DNREC.

Maintaining regional dune features is "especially important in areas with multiple ridges throughout a dune field, areas with man-made dunes, and property-specific revisions, including requests that the PFD designation be removed altogether."[18] *Id.*

In support of its PFD line, FEMA pointed to multiple sources spanning multiple decades to show that the original dune peaks were along Ocean Drive, including South Bethany Sanitary and Sewer Maps from 1973, Topographic Mapping of Delaware Beaches from 1979 from the State of Delaware, descriptions of South Bethany in the 1960s and

---

[18] Appellant contends that FEMA's PFD is invalid because prior FEMA maps for Sussex County identified no PFD in South Bethany. *See* Appellant's Br. at 27-28. But prior effective maps did not identify PFDs because they predate the current FEMA guidance. Coastal flood studies only began to analyze and map dune ridge systems after FEMA published rules and definitions for treating flood hazards near coastal sand dunes on October 1, 1988. JA503; JA530. And the delineation of PFD lines was not always a component of flood hazard. Consistent with then-existing guidance, South Bethany's first coastal hazard analysis from the 1970s does not have a PFD line. The next analysis conducted in 1992 also did not delineate a PFD line; however, it *did* note the presence of a dune and record its features. More specifically, this study showed a slope changing point just seaward of Ocean Drive (which provides additional justification for FEMA's historic delineation of the dune). The 2005 FIRM was a digitization of prior paper maps and relied on the same data from 1992. Consequently, the presence of a PFD in the most recent LOMR reflects changes in mapping practices, not (as Appellant suggests) that FEMA has somehow fabricated the existence of this regional feature in South Bethany.

1970s contained in a document from South Bethany, a 1992 coastal hazard analysis,[19] and topographic data from 2017. JA341; JA383.

Appellant contends that FEMA inappropriately identified this PFD because the area adjacent to the FEMA PFD is flat. Appellant Br. at 25-27. But FEMA explained that, as oceanfront homes were built on top of the dune, the dunes were pushed further seaward and that, based upon construction, the second dune ridge of South Bethany's "mound" type dune was lowered. JA341-JA343. Although man-made conditions have altered the appearance of and degraded the historic dune, FEMA acted reasonably and consistently with FEMA regulations by using historical information to define the regional dune feature. *Id.*

Once again, Appellant offers only his own disagreement with FEMA's analysis—he asserts that FEMA should have treated a USACE-built dune as the PFD. Appellant's Br. at 28. But FEMA explained why Appellant's proposed man-made dune was not an appropriate PFD based upon FEMA guidance. JA341-JA343. More specifically, Standard 619 emphasizes the importance of maintaining

[19] The 2005 FIRM relied upon this coastal hazard analysis, which notes the presence of a dune and a slope changing point just seaward of Ocean Drive.

regional dune features and cautions against altering a regional PFD based on man-made dunes and property-specific revisions. JA341. The USACE-built dune is a man-made dune, and altering the PFD based on this man-made feature would interrupt the delineation of regional dune features. *Id.* FEMA provided a similar example in Texas where FEMA rejected as inappropriate a proposed PFD delineation based on newly formed dunes. *Id.* In the end, FEMA considered Appellant's position in his appeal and concluded that he failed to provide adequate support to change the primary frontal dune as proposed.[20] JA341-JA344.

Accordingly, Appellant has failed to demonstrate that FEMA's delineation of the PFD after looking to historical evidence of regional dune features was arbitrary or capricious.

D. <u>FEMA's application of a Modified Erosion Methodology was not arbitrary or capricious</u>

Appellant argues that FEMA created a "narrative" of exceptional erosion in South Bethany in the face of what he contends is

[20] Appellant faults FEMA for using maps from over 40 years ago. Appellant's Br. at 29. But, consistent with FEMA Standard 619, considering the historical placement of dune fields is important to determine the regional feature, especially given the existence of man-made dunes in South Bethany. In this scenario, it is entirely appropriate to look at these kinds of historical documents.

contradictory evidence. Appellant's Br. at 29-33. He also points to what he characterizes as "wrong or misleading" statements that FEMA used to justify the Modified Erosion Methodology. *Id.* at 33-38. But none of this so-called evidence demonstrates that FEMA acted arbitrarily or capriciously in applying a modified erosion methodology in this case. *Id.* at 33-38. To the contrary, FEMA sufficiently justified its selection of a modified erosion method over a standard erosion method.

FEMA calculates storm-induced erosion for the study area as part of its coastal flood risk analysis. The standard erosion methodology refers to FEMA's default methodology based on general assumptions regarding storm-induced erosion and observed erosion from historical events throughout the country. JA598-JA600. However, each study area has its own unique natural and man-made features that impact storm-induced erosion. JA598. Therefore, FEMA guidance directs the Agency to apply an erosion treatment giving results more consistent with historical records when such information becomes available during the flood risk analysis process. *Id.*

FEMA's standard erosion method was evaluated first with regard

to South Bethany. JA598. However, the results of that method were not consistent with observed historical erosion and historical storm evidence showing the extent of flooding, erosion, and damage to South Bethany. JA344-347; JA586-JA601. As a result, modifications were made to the standard methodology pursuant to FEMA guidance to ensure that the erosion treatment was more consistent with demonstrated local and historic erosion conditions. JA344-347; JA598-JA604. FEMA also evaluated other erosion methods to see if there were accepted methodologies that would reflect historical methods but ultimately determined that the Modified Erosion Method was the most appropriate erosion methodology to achieve erosion behavior consistent with local observations. JA605-JA606. After selecting this method, DNREC officials (who have abundant local storm and erosion knowledge) reviewed the method and agreed with the structure treatment and erosion geometry applied.[21] JA604.

In his brief, Appellant first rallies what he calls "extensive information" that South Bethany incurs the same or less erosion and

---

[21] FEMA provided Appellant with examples of areas in New Jersey where FEMA used non-standard erosion methodologies, including Beach Haven. *See* JA347.

sand loss than other beaches in Delaware and New Jersey. Appellant's Br. at 30. But FEMA explained why the use of the Modified Erosion Methodology in South Bethany was scientifically correct even though neighboring towns, like Bethany Beach, applied the standard erosion methodology. First, FEMA noted physical differences between South Bethany and neighboring communities. Specifically, FEMA explained that dune peaks in South Bethany are further seaward than dune peaks in communities north and south of South Bethany, that South Bethany's dune footprint is "much narrower" than dunes to the north and south, and that dunes in South Bethany are also shorter than those in other communities. JA341; JA346. Accordingly, because of their width, location, and height, the dunes in South Bethany provide less protection than the dunes to the north and south, and FEMA can reasonably expect that storms would cause more severe erosion to South Bethany than neighboring communities. *Id.* Second, FEMA explained that the maps for South Bethany and for neighboring communities were developed at different times and were based upon different data. JA346; *see also* JA166. In particular, the underlying data for the South Bethany map was newer than the underlying data

for the rest of Sussex County, contained more recent topographic data, and was based upon more robust historic storm information. *Id.* As appropriate over time, FEMA will review the maps of the neighboring communities and make revisions. Although this may now result in a different methodology applying to South Bethany than some of its neighboring communities, FEMA has adequately justified that difference. Moreover, requiring FEMA to apply the standard erosion approach to match its neighbors would either require that FEMA publish a technically incorrect analysis or force FEMA to defer the publication of updated data until it was able to undertake a larger study of the entire watershed. Neither outcome is acceptable. In the end, Bethany Beach, Dewey Beach, Rehoboth Beach, and New Jersey beaches are not the subject of this litigation. "[O]ne or even a few storms causing more severe erosion in nearby communities do not support modeling less erosion in South Bethany." JA346.

Appellant then lists so-called "wrong or misleading facts" relied upon by FEMA. Appellant's Br. at 33-38. But even he were right (he is not), Appellant would still not meet the required showing that "the evidence not only supports a contrary conclusion but compels it."

*Sheng*, 365 F. App'x at 410 (internal quotation omitted).[22] That is because FEMA correctly found that historical records demonstrated the actual storm-induced erosion for this area was more severe than what had been modeled using the standard erosion method.[23] FEMA's determination that the Modified Erosion Methodology more accurately modeled storm-induced erosion in South Bethany is neither arbitrary nor capricious.

E. FEMA's wave runup[24] calculations were not arbitrary or capricious

Appellant claims that FEMA's wave runup calculations are both incorrect and inconsistent with FEMA's guidance because FEMA failed to remove wave setup in the SWELs. Appellant is correct that FEMA

[22] Appellant is right, at 33-34, that Bethany Beach is not shown in Figure 1 of the Appeal Resolution Letter even though FEMA cited it as support for the assertion that dunes in Bethany Beach are taller and wider than those in South Bethany, JA346. Figure 1 instead demonstrates that the dune in South Bethany is further seaward and narrower than the dunes north and south of it. JA341-JA342. Appellant is wrong that the facts show that the dunes in South Bethany and Bethany Beach are the same size. Appellant's Br. at 34.

[23] Appellant baldly states that no flooding or damage has occurred since the 2008 USACE nourishment project. Appellant's Br. at 36-37. That is not true. Both damage and flooding have occurred since 2008. *See, e.g.*, JA589; *see also* JA39-JA40.

[24] Wave runup is the maximum vertical extent of wave uprush on a beach, dune, or structure above the SWEL. JA607.

did not remove wave setup from its model. He is also correct that earlier guidance from 2007 directed the mapping partner to do so. *See* JA524. However, Appellant is wrong that FEMA's failure to remove wave set up resulted in incorrect calculations. Rather, FEMA's wave runup calculations are properly estimated and are consistent with FEMA practice for coastal FIS and FIRM development. Moreover, FEMA's wave runup calculation was based on consideration of relevant data and supported by satisfactory explanation.

FEMA utilized the Runup 2.0 model with SWELs from a 2D ADCIRC+SWAN model that contains a wave set up component that is coupled or integrated into the wave and surge modeling.[25] JA607-608; JA348. This is consistent with "all other countywide FIS and LOMRs in Atlantic coast counties," including Sussex County, Delaware. JA348.

[25] The storm surge model was completed by USACE and was intended to be an end-to-end storm surge modeling system. JA584. ADCIRC stands for Advanced Circulation model and SWAN stands for Simulating Waves Nearshore. *Id.* The model dynamically coupled ADCIRC to SWAN to better understand the contribution of waves (via wave setup) to total storm surge levels. *Id.* "This system, which links together state-of-the-art wind, wave and surge models into a comprehensive tool for surge- and wave-hazard determination, has been extensively verified and validated in terms of both the individual model components and the networked/coupled system of models." JA363; JA1215.

Because FEMA previously recognized that this process had the potential to overstate wave setup and wave runup values, a few years ago, FEMA commissioned a sensitivity study in Carteret County, North Carolina to evaluate the extent that the inclusion of wave setup in the combined elevations from coupled ADCIRC+SWAN could bias wave runup values. *See* JA348; JA415. That study concluded that any wave setup included in the water levels from coupled ADCIRC+SWAN used in calculations of wave runup using Runup 2.0 did not materially impact modeling results. JA348; JA459; JA467. Since that study, FEMA has consistently applied the coupled ADCIRC+SWAN model and water levels inclusive of wave setup outside of North Carolina.

Appellant fails to appreciate the role of FEMA guidance and the fact that coastal modeling best practices have changed since the guidance he cites was published nearly twenty years ago, in February 2007. Turning first to the role of guidance, while these document FEMA's understanding of the science at a given moment, they do not compel FEMA or its mapping partners to conduct analyses that are inconsistent with the state of the science as it has evolved from the point that guidance was issued. In fact, the guidance cited by Appellant

specifically acknowledges this point. *See* JA489 ("These Guidelines offer insight and recommend methods to analyze hurricane and northeaster flood events . . . in a reasonable and consistent way. However, they require technical judgment and experience in their application and do not generally offer a prescriptive technique that can be applied uniformly in all study areas."); JA490 ("Advancements in current technology are being made at a rapid pace and these Guidelines need to be revisited in the future to incorporate these changes. . . . FEMA recognizes that the Guidelines are an evolving documentation of the study procedures for the NFIP[.]").

Next, FEMA's coastal modeling best practices have evolved and advanced over time to its current state where a coupled model dynamically simulates the linked processes of waves and storm surge. Both experience and current practice demonstrate that using the current "state of the art" modeling (ADCIRC+SWAN) eliminates the need to conduct a separate wave setup analysis as it is inherent within the coupled wave and surge modeling. *See generally* JA362. This coupling of models was not commonly used at the time of the 2007 guidance but was in the process of being incorporated into FEMA

guidance at the time of FEMA's analysis.[26] *See generally* JA684.[27]

To do as Appellant suggests (removing wave setup from the ADCIRC+SWAN-based SWEL) is not feasible given the complex statistical analysis used in the model (the setup contributions are not tied to a specific event or frequency but are inherently embedded in the

[26] Appellant suggests that the FEMA Guidance for Flood Risk Analysis and Mapping: Coastal Wave Runup and Overtopping that was is draft form at the time of the appeal does not say what FEMA thinks it does. Appellant's Br. at 41-42. Importantly, the intent of the guidance update was to make it conform to the current process as it has evolved from the previously issued guidance. The draft guidance says that "[i]n some flood studies where the SWEL surface implicitly includes wave setup (such as 2D ADCIRC+SWAN-based storm surge studies), the recommendations in Section 8.3 are no longer valid and wave setup must be assumed as implicit in the SWEL value for each runup method." JA706; JA731. When 2D ADCIRC+SWAN modeling is employed in deriving statistical quantities (as in this case), it is not possible to remove wave setup from the statistical quantity.

[27] Notably, the draft Guidance was published in November 2023 and says, for example, "In some flood studies where the SWEL surface implicitly includes wave setup (such as 2-D ADCIRC+SWAN-based storm surge studies), the recommendations in Section 2.3 of Appendix A cannot be applied. Wave setup cannot be efficiently removed from the SWEL + Setup 1% annual-chance surface, and consequently, common practice applies all runup methods to this surface assuming a negligible impact to the runup elevation." Guidance for Flood Risk Analysis and Mapping: Coastal Wave Runup and Overtopping, at 62 https://www.fema.gov/sites/default/files/documents/fema_rm-coastal-wave-runup-and-overtopping-nov-2023.pdf (last visited Aug 21, 2026). This language confirms FEMA's belief that using ADCIRC+SWAN stillwater inclusive of wave setup in runup modeling with Runup 2.0 is adequate for FIS and FIRMs.

modeling resulting statistics). And FEMA is not prepared to make rudimentary assumptions as Appellant suggests in an attempt to remove wave setup. Trying to remove a separately estimated wave setup from the combined modeling and statistics does not accurately capture the amount of wave setup within the SWEL result and risks removal of some of the storm surge component from SWEL, erroneously reducing the flood risk. Appellant offers no scientific justification either for his back-of-the-napkin attempt to remove wave setup from the calculation or for his assumption that doing so would improve the accuracy of the result. And, as noted above, even if Appellant were correct that approach to removing wave setup was reliable, he has not shown that FEMA's chosen methodology was unreasonable.

Accordingly, FEMA cannot be said to have acted arbitrarily or capriciously merely because its methods varied from decade-old guidance based on the incorporation of subsequent advancements in technology.

Appellant also argues that FEMA acted improperly when it applied the conclusions of the sensitivity study to South Bethany. Appellant's Br. at 40-41. As noted in the Appeal Resolution Letter,

FEMA has utilized the same methodology evaluated in the sensitivity study on the entire Delaware coast and in multiple states along the Atlantic coastline. JA348. FEMA applied those conclusions given the similarities generally across the central Atlantic coast, *see* JA510 (describing this area), and given that Carteret County, NC and South Bethany both have beaches with a gentler slope and were suited for the Runup 2.0 model using ADCIRC+SWAN inputs directly, *see* JA459; JA608.[28]

In all, FEMA's estimation of wave run up in this case was neither arbitrary nor capricious. The method used by FEMA has become standard practice in instances (such as in South Bethany) where it is appropriate to employ the Runup 2.0 model. That state-of-the-art practice has been incorporated into updated FEMA guidance. Finally, Appellant's recommendation for removing wave set up is neither feasible given the complex statistical analysis used in the ADCIRC+SWAN model nor supported by anything in the

---

[28] The sensitivity study itself acknowledges that there are financial constraints associated with all modeling decisions, a tacit acknowledgment of the fact that modeling, by its very nature, is charged with processing available information and making rational conclusions about that data. JA406.

administrative record.

F. FEMA's conclusion that Appellant's alternate analysis did not result in a more correct analysis was not arbitrary and capricious

Finally, Appellant asserts that he provided a scientifically and technically correct flood map applying a standard erosion methodology. Appellant's Br. at 44. As a preliminary matter, while such a showing could in theory provide a basis for modification in an administrative appeal, *see* 44 C.F.R. § 67.6(a), it has no application in this litigation where the Court is limited to the narrower standard of review dictated by the APA, *see* 42 U.S.C. § 4104(g).

Even setting that issue aside, however, Appellant is simply wrong. He has failed to demonstrate, as he would be required to do even in an administrative appeal, that "alternative methods or applications result in more correct estimates of base flood elevations." 44 C.F.R. § 67.6(a).

As set out in FEMA's Appeal Resolution Letter, the standard erosion method suggested by Appellant does not account for historical data and the fact that South Bethany has been severely damaged from flooding and erosion. JA349. As a result, Appellant's analysis underestimates the anticipated volume of erosion expected based upon

observed historical data. *Id.* The damage from these events is well documented throughout the record. *See, e.g.*, JA587. Appellant's proposal that FEMA and this Court simply ignore those documented observations in favor of his own analysis is unsupported by any scientific justification.

Furthermore, Appellant's analysis failed to include all the information necessary for FEMA to determine whether Appellant's proposed analysis would result in superior flood hazard determinations: namely, "the modeling inputs and outputs for WHAFIS and Runup 2.0 were not provided with the submittal."[29] JA349. Accordingly, FEMA's rejection of Appellant's methodology and analysis was not arbitrary or capricious because his analysis failed to account for observed historical data *and* because it did not include all the information necessary for FEMA to determine whether Appellant's proposed analysis would result in superior flood hazard determinations.

[29] There is no requirement that FEMA request additional data from appellants when their data is lacking. To the extent Appellant now has additional data, he can apply for a map revision at any time under 44 C.F.R. Part 65.

## CONCLUSION

For the reasons stated above, the Court should affirm the District Court.

Respectfully submitted,

Benjamin L. Wallace
United States Attorney

By: */s Claudia L. Pare*
Claudia L. Pare
Assistant United States Attorney
United States Attorney's Office
1313 N. Market Street, Suite 400
Wilmington, DE 19801
(302) 573-6603

Dated: August 24, 2026

## COMBINED CERTIFICATIONS

1. **CERTIFICATE OF BAR MEMBERSHIP**

The undersigned is a federal lawyer exempt from the Court's membership requirements.

2. **CERTIFICATE OF WORD COUNT**

The undersigned certifies that this brief contains 8,662 words, exclusive of tables, certifications and addenda, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

3. **CERTIFICATE OF SERVICE**

I hereby certify that this brief has been served on the Filing User identified below through the Electronic Case Filing System:

Edward E. Bintz
922 N. Cleveland St.
Arlington, VA 22201
Ed.Bintz100@gmail.com

4. **CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF**

The undersigned certifies that the PDF electronic copy of this brief and the hard copies of this brief are identical.

5. **CERTIFICATE OF VIRUS CHECK**

The undersigned certifies that a virus check was performed on this brief using CrowdStrike AV (Antivirus).

*/s/ Claudia L. Pare*
Claudia L. Pare
Assistant United States Attorney

Date: August 24, 2026